**Opinion issued March 2, 2023**



In The

# Court of Appeals

For The

# First District of Texas

_____

### NO. 01-21-00394-CV

_____

## PAMELA KINNEY, Appellant

## V.

## CHARLES PATRICK BATTEN, Appellee

---

**On Appeal from the 507th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-26471**

---

### MEMORANDUM OPINION

This appeal arises from a suit affecting the parent-child relationship. In 2011, a Fort Bend County trial court issued an order appointing appellant Pamela Kinney and appellee Charles Patrick Batten as the joint managing conservators of their minor child, B.E.K. (the "2011 Order"). The order granted Kinney the exclusive

right to designate the child's primary residence and ordered Batten to pay child support. The 2011 Order was affirmed on appeal. *See Kinney v. Batten*, No. 01-11-00393-CV, 2012 WL 2928501, at *5 (Tex. App.—Houston [1st Dist.] July 19, 2012, pet. denied) (mem. op.).

In 2018, Kinney filed the instant suit, seeking to modify the 2011 Order. Kinney sought sole managing conservatorship of B.E.K. and sought to terminate Batten's parental rights. Batten filed a counter-petition, in which he sought sole managing conservatorship of B.E.K. and child support. The trial court appointed an amicus attorney to assist in protecting the child's best interests.

The conservatorship and termination issues were tried to a jury, which found that Battan should be appointed as B.E.K.'s sole managing conservator. The issues of possession and access, child support, and attorney's fees were tried to the bench.

Afterwards, the trial court found that the circumstances of the child had materially and substantially changed since the rendition of the 2011 Order. Specifically, that Kinney had engaged in a "history or pattern of child abuse" directed at B.E.K. The trial court appointed Batten as the sole managing conservator of B.E.K., with the exclusive right to designate her primary residence. The trial court made Kinney a possessory conservator, but ordered that her access to B.E.K. be continuously supervised. It also ordered that Kinney pay child support and attorney's fees.

Kinney appeals. In four issues, Kinney contends that the trial court erred in allocating time to the parties during trial, in calculating child support, in denying her motion to remove the amicus attorney, and in awarding attorney's fees to the amicus.

We affirm in part and reverse and remand in part.

## Background

In her petition to modify the 2011 Order, Kinney alleged that the circumstances of B.E.K. had materially and substantially changed in that Batten was providing medications to B.E.K. that he "knew were harmful to her health" or that he "knew contained dangerous elements added to the medicine." She asserted that B.E.K. had been exposed to toxic levels of heavy metals while in Batten's care. Kinney requested sole managing conservatorship of B.E.K., with the exclusive right to designate her primary residence.

Kinney sought to terminate Batten's parental rights on the ground that he had engaged in conduct, or had knowingly placed B.E.K. with another who had engaged in conduct, that had endangered the child's physical or emotional well-being.[1] Kinney also sought an order enjoining Batten from going within 200 feet of any residence, school, childcare facility, or location in which he knew that B.E.K. was present.

---

[1] *See* TEX. FAM. CODE § 161.001(b)(1)(E).

Kinney requested, in the alternative, that the trial court issue an order restricting Batten's access to B.E.K. and ordering him "to give the child her prescription medication as directed by a physician [and] in strict compliance with the prescription." Kinney also requested that child support be increased.

In his amended counter-petition, Batten also alleged that the circumstances of the child had materially and substantially changed since the rendition of the 2011 Order. Batten claimed that Kinney had engaged in a history or pattern of abuse and neglect of B.E.K. He sought sole managing conservatorship of B.E.K., requested that Kinney be granted only supervised possession and access, and asked that she be ordered to pay child support.

In addition, Batten asked the trial court to appoint an amicus attorney "to ensure the determination of the best interests of the child" and asked that Kinney be ordered to pay the amicus reasonable attorney's fees and expenses.[2]

The trial court appointed Julie Ketterman as an amicus attorney to assist it in protecting the child's best interest. The trial court ordered that Ketterman fulfill all the duties of an amicus attorney and that she was "entitled to reasonable fees and expenses."[3] The court further ordered that "[a]ll amicus fees" were to be paid 90 percent by Batten and 10 percent by Kinney.

---

[2] *See id.* § 107.021.

[3] *See id.* § 107.001, .003, .005, and .023.

4

In September 2020, Kinney, Batten, and the amicus attorney attended mediation, which ended in an impasse. Subsequently, with trial set to begin shortly, Kinney filed a motion in the trial court requesting that Batten and the amicus attorney "share six peremptory strikes because their interests [were] aligned." Kinney asserts on appeal that the motion was granted, but does not direct us to an express ruling.

A jury trial on the issues of termination and conservatorship began in December 2020. At trial, Thelma Osberg testified that she is the maternal grandmother of B.E.K., who was born in 2005. In early 2012, B.E.K. began experiencing chest pain, headaches, and body aches. Osberg called "Day Star Prayer Ministries" and spoke with Dr. Maurice Stevens, a retired pediatric toxicologist. According to Osberg, Stevens advised that B.E.K. should be tested for exposure to heavy metals. Osberg and Kinney then conducted online research and found a laboratory, ExperTox, Inc., to test B.E.K. Osberg testified that the test results later showed that B.E.K. had been exposed to arsenic and "other heavy metals."

Osberg further testified that she contacted numerous medical professionals but was unable to find anyone willing to treat B.E.K. for exposure to heavy metals. Through "random searches online," Osberg found a pediatric toxicologist in New York, Dr. Roger Mazlin, who recommended a "chelation regimen." According to Osberg, Mazlin directed that B.E.K. "drink volcanic water," "as much as possible," and eat cilantro in refried beans, "as often as she [would] eat it."

5

B.E.K. followed Dr. Mazlin's "chelation" treatment for approximately one month. During that time, Osberg tried unsuccessfully to find a doctor willing to write a letter to restrict B.E.K. from visiting Batten.

Kinney testified that she and Batten had never lived together. At the time of trial, Kinney and B.E.K., who was fifteen years old, were living in the Houston area, and Batten was living near Austin.

Kinney testified that, in 2011, B.E.K. had been complaining of stomach pain, leg pain, diarrhea, and vomiting. Kinney learned that, during B.E.K.'s visits with Batten, he had been giving her a nasal spray containing a steroid. Although Kinney confirmed that a pediatrician had prescribed a nasal spray for B.E.K., Kinney learned that Batten had not gotten the prescribed medication from the pharmacy. Kinney became concerned that Batten had substituted a different nasal spray and that it was making B.E.K. ill. Kinney instructed Batten to stop giving B.E.K. the medication, but he had refused.

On May 29, 2012, Kinney, prompted by Osberg's telephone discussion with Dr. Stevens, mailed a sample of B.E.K.'s hair to ExperTox to test for the presence of arsenic, cadmium, chromium, lead, and mercury. The trial court admitted the lab results into evidence, which stated that the elements were detected, but at levels below each stated "High Value." In June 2012, Kinney contacted Dr. Mazlin in New York, who directed Kinney to perform the "home chelation" discussed above.

6

Kinney testified that, between 2011 and 2018, she had taken B.E.K. to "20 to 25 doctors" because she "had symptoms." Kinney testified that she had also mailed in samples of B.E.K.'s hair, urine, blood, and nasal swabs to ExperTox in October 2013 (six tests), December 2013 (seven tests), January 2014, March 2014, July 2015, and August 2020, and that she was still, at the time of trial, continuing to have B.E.K. tested. The trial court admitted into evidence each of the ExperTox lab results.

An ExperTox lab report, dated March 17, 2014, stated that a "Self Test," i.e., "Client Submitted Sample," of B.E.K.'s blood contained high levels lithium, beryllium, manganese, thorium, zinc, platinum, and uranium.

In 2014, Kinney contacted the Houston Police Department ("HPD") and complained that Batten was poisoning B.E.K. during her visits with him. HPD transferred the complaint to the Williamson County Sheriff's Office ("WCSO"). Kinney testified that WCSO Detective D. Foiles obtained the nasal spray from Batten, and had it tested, and that "they found heavy metals in it." She testified that, on June 9, 2014, Detective Foiles took B.E.K. to Round Rock Medical Center ("RRMC") for examination and blood testing and that the results were within normal reference ranges. Kinney admitted that Detective Foiles had warned her against intentionally tampering with the mail-in samples she was sending to ExperTox and had threatened to pursue criminal charges if she continued.

Kinney also admitted that, in 2014, Dr. Richard Walker at Concentra Urgent Care in Houston, who had examined B.E.K. and performed independent blood testing on her, had concluded that B.E.K. was not being poisoned.

Finally, Kinney testified:

Q.     . . . . All of this started because your mother [Osberg] talked to a retired doctor that you never spoke with and stated based on that conversation that he believed your daughter was being poisoned . . . ; is that what you're saying?

A.     Yes.

. . . .

Q.     And the recommendation that was given to you for that treatment was based on a doctor that is not licensed in Texas that never saw or spoke to [B.E.K.] when making that recommendation, correct?

A.     Yes.

Ernest Lykissa testified that he owns ExperTox and no longer has a medical license. He admitted that the majority of the samples tested in this case were mailed to ExperTox and had no chain of custody established. Further, some of the samples submitted were "environmental" swabs from around B.E.K.'s home. Although Lykissa had previously concluded that B.E.K. was contaminated with heavy metals while at Batten's house, he agreed that none of B.E.K.'s results in 2012 were in the toxic range of arsenic. He noted that her exposure to organic arsenic most likely came from eating shellfish, that her exposure to aluminum could have come from cooking utensils, and that lithium is normally found in well water.

8

Dr. Noreen Khan-Mayberry, a toxicologist testifying as an expert, stated that she reviewed reports from four toxicologists, including Lykissa. She concluded that B.E.K. had suffered "chronic exposure" to heavy metals, including arsenic, antimony, barium, mercury, zinc, copper, cobalt, tin, platinum, and uranium, that came from a bottle of fluticasone propionate nasal spray that B.E.K. had obtained from Batten. She testified, however, that she did not realize that the samples underlying the reports were submitted to ExperTox through at-home self-testing kits.

Detective Foiles testified that he specializes in crimes against children and that he was assigned to investigate Kinney's complaint that Batten had been poisoning B.E.K. with nasal spray. Detective Foiles went to Batten's house and arranged for B.E.K. to be tested at RRMC for exposure to toxins or heavy metals. The trial court admitted into evidence a report from RRMC, dated June 9, 2014, reflecting results within normal ranges or "none detected."

Detective Foiles noted that B.E.K.'s medical records showed that she had seasonal allergies and had been prescribed nasal spray. Foiles testified that he interviewed B.E.K.'s pediatrician, Dr. Carla Ramsey, who "advised me she was well aware of [Kinney's] assertion that [Batten] was poisoning [B.E.K.] and stated she, Dr. Ramsey, had never seen any indication of poisoning." Dr. Ramsey stated that she had warned Kinney against self-testing B.E.K. without a physician's order and told her that, if an order were given, it should only be performed at a reputable lab.

9

Detective Foiles further testified that he interviewed Dr. Walker, who had examined B.E.K. and conducted independent blood testing. Walker stated that he had informed Kinney that the findings were "unremarkable," meaning that there was "nothing wrong" with B.E.K. Foiles testified that, because there was no indication that B.E.K. had actually been poisoned, the bottle of nasal spray was not tested.

Dr. Patricia Rosen, an internist and toxicologist testifying as an expert, stated that she reviewed B.E.K.'s medical records dated June 2010 to July 2015. She opined that there was "no evidence of heavy metal poisoning" and "no clinical indication of any sort of poisoning." She noted, for instance, that "people with arsenic poisoning have vomiting, diarrhea, . . . get muscle weakness, [and] they develop cardiac abnormalities." Further, chronic exposure causes abnormalities in the liver enzymes and severe anemia. B.E.K.'s records showed that her "review of systems," clinical exams, and blood chemistries were normal. Dr. Rosen further testified that there was no indication that any of the toxin testing was necessary.

Batten testified that he and Kinney were in a short relationship before B.E.K. was born. He and his wife, Leslie, were living in a four-bedroom house with a yard and near trails, and B.E.K. had her own room when she visited. Batten also testified that he saw B.E.K. every month, on holidays, and during the summer. He characterized B.E.K. as a happy and smart kid. He and his wife had a great relationship with her, and, during visits, they played sports and traveled.

10

Batten further testified that he was seeking sole managing conservatorship of B.E.K. because he was concerned that Kinney was "dangerous" and that B.E.K. was "being abused." Because he provided B.E.K.'s insurance, he was able to view each time it was used for her care. He estimated that Kinney had taken B.E.K. to 75 to 100 doctors and that B.E.K. had never been professionally diagnosed with any of the ailments that Kinney had claimed. Batten noted that he had been subjected to numerous investigations by the Texas Department of Family and Protective Services and WCSO, all at the behest of Kinney and Osberg. Each time, the complaint that he was poisoning B.E.K. had been ruled out.

Leslie then testified that she and Batten had been married for eleven years. When B.E.K. visited, they spent time together as a family, playing games, watching movies, and roller skating. She noted that they had been ziplining and horseback riding together and that B.E.K. had attended camp. Leslie had never seen any of the symptoms in B.E.K. that Kinney had reported.

During trial, Kinney filed a "Motion to Remove [the] Amicus Attorney." Kinney argued that the amicus, Ketterman, was biased against Kinney, had "attempted to bias the child against her mother," and had not acted in the best interest of the child. The trial court denied Kinney's motion.

At the close of trial, the jury found that Batten should be appointed as B.E.K.'s sole managing conservator.

In January 2021, the trial resumed as a bench trial on the remaining issues, i.e., possession and access, child support, and attorney's fees. Kinney retained two additional attorneys, who presented further evidence on the issues of possession and access. The trial court stated on the record that it would consider the testimony offered during the jury trial and directed the parties not to repeat the evidence.

Kinney testified regarding her ability to pay child support, as discussed below. Batten requested that Kinney's visitation of B.E.K. be supervised. He feared that Kinney would otherwise continue to subject B.E.K. to needless medical testing. Batten also presented testimony in support of his attorney's fees.

In its final order, the trial court found that the circumstances of the child had indeed materially and substantially changed since the rendition of the 2011 Order, in that Kinney had demonstrated a "history or pattern of child abuse" directed at B.E.K. The trial court further found that the modifications requested in Batten's counter-petition were in the best interest of the child. It then appointed Batten the sole managing conservator of B.E.K., with the exclusive right to designate her primary residence.

The trial court also found that that it was not in B.E.K.'s best interest for Kinney to have unsupervised access to her. It appointed Kinney a possessory conservator, but ordered that her periods of access to B.E.K. be continuously supervised.

The trial court additionally ordered that Kinney pay monthly child support in the amount of $397.17, retroactive support in the amount of $1,191.51, and attorney's fees to Batten in the amount of $70,000.00. It awarded attorney's fees to the amicus against Batten in the amount of $3,405.66 and against Kinney in the amount of $5,505.06. The trial court further ordered that the amicus attorney was entitled to all necessary writs and processes for the enforcement and collection of the award, including the issuance of execution, which it thereby ordered.

In support of its order, the trial court issued findings of fact and conclusions of law stating, in pertinent part, as follows:

17. [Kinney] was not a credible witness.

18. Dr. Ernest Lykissa was not a reliable nor credible witness.

19. Reports from ExperTox were not reliable.

20. Dr. Roger Mazlin from New York never saw the child.

21. [Kinney] has a history or pattern of past or present child abuse directed against the child.

22. It is not in the child's best interest for [Kinney] to have unsupervised access to the child.

23. [Kinney] relied on a report from Dr. Roger [Mazlin]; a doctor who never conducted a medical examination of the child or even saw the child.

24. For several years, [Kinney] submitted the child to multiple heavy metal testing without first having an actual medical doctor examine the child for heavy metals.

25. [Kinney] continued to rely on results of testing conducted on samples that she, allegedly, personally collected from the child and forwarded for testing.

13

26. [Kinney] testified that the child was still in diapers at twelve years of age.

27. [Kinney] testified that the child was still not able to comb her own hair at the age of fourteen.

28. The circumstances of the child or a party have materially and substantially changed since the date of the rendition of the prior order.

29. The terms modified regarding conservatorship, child support, and possession and access are in the best interest of the child.

30. The provisions in the final order regarding child support to be paid by [Kinney] are in compliance with the child support guidelines found in the Texas Family Code.

    (1) the net resources of the obligor per month are $ $1,985.85;
    (2) the net resources of the obligee per month are $ 0.00;
    (3) the percentage applied to the obligor's net resources for child support is 20%; and

31. The application of guidelines is fair and just.

. . . .

37. Julie Ketterman [the amicus] was entitled to reasonable attorney's fees and expenses for the services she provided.

38. Julie Ketterman was owed an outstanding balance of $8,910.12.

39. [Kinney] is ordered to pay amicus attorney's fees to Julie Ketterman in the amount of $5,505.06 for reasonable and necessary amicus attorney's fee and expenses.

40. [Batten] is ordered to pay amicus attorney's fees to Julie Ketterman in the amount of $3,405.06 for reasonable and necessary amicus attorney's fee and expenses.

41. [Kinney's] litigiousness and bad faith conduct exhibited during the prosecution of this case necessitated the parties incurring otherwise needless amicus attorney's fees.

42. The amicus attorney's fees awarded are necessaries for the benefit of the child.

**Allocation of Time at Trial**

In her third issue, Kinney asserts that the trial court's "allocation of time for presenting evidence to the jury resulted in a materially unfair trial." She asserts that Batten and the amicus attorney were "aligned on the same side of the case," that the time they were each allocated to present their case should have been combined, and that she, Kinney, should have been granted four additional hours to equalize the time. Kinney asserts that "[n]o caselaw directly addresses this issue," and she urges this Court to apply the law governing the allocation of peremptory strikes.

We review a trial court's imposition of time limits at trial, and the exclusion of evidence due to the imposition of time limits, under an abuse-of-discretion standard. *In re M.A.S.*, 233 S.W.3d 915, 924 (Tex. App.—Dallas 2007, pet. denied); *State v. Reina*, 218 S.W.3d 247, 254–55 (Tex. App.—Houston [14th Dist.] 2007, no pet.).[4]

Every trial court has the inherent power to control the disposition of the cases on its docket "with economy of time and effort for itself, for counsel, and for litigants." *State v. Gaylor Inv. Trust P'ship*, 322 S.W.3d 814, 819 (Tex. App.—

---

[4]     *See also Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001) (stating that "the discretion vested in the trial court over the conduct of a trial is great" and that trial courts "may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time" (internal quotations omitted)).

Houston [14th Dist.] 2010, no pet.).[5] Such inherent power, together with the applicable rules of procedure and evidence, afford trial courts broad, but not unfettered, discretion in handling trials. *Id.*

This broad discretion must be exercised reasonably, and a party must be given a fair opportunity to present its case so that the factfinder may ascertain the truth. *Sims v. Brackett*, 885 S.W.2d 450, 455 (Tex. App.—Corpus Christi 1994, writ denied). "[W]hen trial courts have set time limits with the input of parties and then held parties to those time limits, reviewing courts have not found a denial of a fair trial." *E.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00473-CV, 2018 WL 6627720, at *5 (Tex. App.—Austin Dec. 18, 2018, pet. denied) (mem. op.); *see, e.g.*, *Reina*, 218 S.W.3d at 254–56.

Here, it is undisputed that the trial court initially allocated 30 hours for trial, with 10 hours each to Kinney, Batten, and the amicus. The amicus then surrendered one hour to Kinney and one hour to Batten. Thus, the final allocation was 11 hours to Kinney, 11 hours to Batten, and 8 hours to the amicus.

---

[5] *See* TEX. R. EVID. 611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."); *In re M.A.S.*, 233 S.W.3d 915, 924 (Tex. App.—Dallas 2007, pet. denied) ("A trial court has the authority to control the presentation of evidence so as to avoid needless consumption of time.").

The record shows that, after the jury was sworn in, the trial court stated that the trial would not extend beyond one week in duration, as follows:

> Right now [the duration of trial is] expected to go the entire week. It may or may not go the entire week, but it will not go more than a week. So it's set to end next Friday. Each of the attorneys has a specific time and that's all of the time that they have allotted. . . .

On the last day of the week-long jury trial, Kinney filed a "Motion to Reallocate Time for the Presentation of Evidence." She asserted that the amicus attorney had used "all of her time in support of [Batten's] position." Namely, the amicus had led witnesses who were not adverse, contested Kinney's experts, "harass[ed]" Kinney's witnesses, and had untimely designated one of Batten's witnesses as an expert.

Kinney asked that "all [the] time used by the amicus be assessed for [Batten]" and that the trial court conclude that Batten had actually been afforded 19 hours to present his case and that she had been afforded only 11. Kinney asserted that she had "remaining witnesses, cross-examination of [Batten's] remaining witnesses, and closing arguments" and that "the two hours of time remaining [was] insufficient to provide . . . a fair presentation." She also asked the trial court for four additional hours, which the trial court denied.

An amicus attorney is statutorily required to "advocate the best interests of the child after reviewing the facts and circumstances of the case." TEX. FAM. CODE § 107.005(a). Such advocacy does not constitute an "alignment" with a parent.

17

Here, the trial court could have reasonably declined to conclude that "*all*" of the time used by the amicus should be "assessed for" Batten. (Emphasis added.)

Further, a party complaining that a trial court erred in limiting her time to present her case, and thereby prevented her from presenting all of her evidence, must object to the time limit *and* make an offer of proof of the evidence that she was prevented from presenting in order to preserve error for appeal. *E.J.*, 2018 WL 6627720, at \*5; *Goss v. Goss*, No. 04-16-00809-CV, 2018 WL 340139, at \*2 (Tex. App.—San Antonio Jan. 10, 2018, pet. denied) (mem. op.).[6]  Kinney failed to do that.

Although Kinney generally objected to adhering to the time limits, she did not make either an offer of proof at trial or a post-trial bill of exception setting forth any specific evidence excluded based upon the complained-of time constraint. *See E.J.*, 2018 WL 6627720, at \*6; *see also* TEX. R. APP. P. 33.2 (addressing formal bills of exception).  Moreover, on the last day of trial, after Kinney finished her testimony,

---

[6]     *See also* TEX. R. EVID. 103(a); *In re Ludington*, No. 01-16-00411-CV, 2017 WL 219162, at \*4 (Tex. App.—Houston [1st Dist.] 2017, orig. proceeding); *In re A.E.A.*, 406 S.W.3d 404, 420 (Tex. App.—Fort Worth 2013, no pet.) (holding that, because appellant did not "make an offer of proof concerning evidence that was excluded because of the allegedly restrictive time constraints, we have nothing to review"); *Health Enrichment & Longevity Inst., Inc. v. State*, No. 03-03-00578-CV, 2004 WL 1572935, at \*4–5 (Tex. App.—Austin July 15, 2004, no pet.) (mem. op.) ("Assuming that the effect of the time limit was to exclude evidence, error may not be predicated on a ruling excluding evidence unless a party makes known to the court the substance of the evidence by an offer of proof.").

the trial court gave her an opportunity to call another witness. But Kinney declined and instead simply rested her case.[7]

Also on the final day of trial, after Batten and Leslie each testified, Kinney told the trial court that she had "no further questions." Kinney and Batten then each gave closing argument that spanned equal length in the transcript.

Because the record does not reflect that Kinney made the trial court aware of any evidence that she would have introduced, had she been granted additional time, we hold that Kinney failed to preserve for our review her complaint that the trial court abused its discretion by denying her motion for additional time to present her case on the last day of trial. *See E.J.*, 2018 WL 6627720, at *6; *see, e.g.*, *Askew v. State*, No. 03-03-00661-CV, 2005 WL 121862, at *3 (Tex. App.—Austin Jan. 21, 2005, no pet.) (mem. op.) (holding error not preserved because appellant did not "file a formal bill of exception showing who she would have called and what their testimony would have been").

We overrule Kinney's third issue.

---

[7]     *See Johnson v. Nat'l Oilwell Varco, LP*, 574 S.W.3d 1, 8 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("Johnson does not point to any place in the record where counsel renewed her objection or attempted to present a witness that the trial court did not permit."); *Goss v. Goss*, No. 04-16-00809-CV, 2018 WL 340139, at *2 (Tex. App.—San Antonio Jan. 10, 2018, pet. denied) ("When Andrew finished his testimony, the trial court gave Andrew an opportunity to call another witness. Andrew did not call another witness, but simply rested his case.").

**Child Support**

In her second issue, Kinney argues that the trial court erred in ordering her to pay monthly child support of $397.17. According to Kinney, the "only and undisputed evidence was that [her] monthly net resources are only about $120 per month," which "yields a child support obligation of $18 per month," and the trial court did not make the findings required to vary from this amount. *See* TEX. FAM. CODE § 154.130. Kinney also asserts that the trial court erred in awarding retroactive child support.

*Standard of Review and Legal Principles*

We review a trial court's decisions regarding child support also under an abuse of discretion standard. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable." *Id.* A trial court also abuses its discretion if it fails to analyze or apply the law correctly. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011).

In an appeal from a bench trial, a trial court's findings of fact have the same weight as a jury's verdict. *In re K.R.P.*, 80 S.W.3d 669, 673 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). Accordingly, we apply the same standards in reviewing the sufficiency of the evidence supporting the trial court's fact findings as

we apply to reviewing a jury's answer. *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

Under the abuse-of-discretion standard, legal and factual sufficiency challenges do not constitute independent grounds for asserting error, but are relevant factors in determining whether a trial court abused its discretion. *Moore v. Moore*, 383 S.W.3d 190, 198 (Tex. App.—Dallas 2012, pet. denied).

To determine whether a trial court abused its discretion because the evidence is legally or factually insufficient to support its decision, we consider (1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether it erred in applying its discretion. *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied). That is, we conduct the applicable sufficiency review under the first prong. *Id.* We then determine whether, based on the evidence before it, the trial court made a reasonable decision. *Id.* A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support its decision. *Id.*

The Family Code allows a trial court to modify a support order if, as pertinent here, the circumstances of the child or a person affected by the order have "materially and substantially changed" since the date of the order's rendition. *See* TEX. FAM. CODE § 156.401(a)(1). A trial court retains broad discretion in making the equitable

21

decision of whether to modify a prior support order. *Friermood v. Friermood*, 25 S.W.3d 758, 760 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

Under Chapter 154 of the Texas Family Code,[8] the amount of an obligor's child support is calculated by applying the statutory guidelines to the obligor's "monthly net resources." *See* TEX. FAM. CODE §§ 154.062(a), 154.121–.133. A trial court must first add the obligor's gross resources, including:

(1) 100 percent of all wage and salary income and other compensation for personal services (including commissions, overtime pay, tips, and bonuses);

(2) interest, dividends, and royalty income;

(3) self-employment income;

(4) net rental income . . . ; and

(5) all other income actually being received . . . .

*Id.* § 154.062(b). The trial court must then "deduct the following items from [the gross] resources to determine the net resources available for child support: [taxes, union dues, expenses for health insurance, and any nondiscretionary retirement plan contributions]." *Id.* § 154.062(d). These guidelines are presumptively reasonable. *Id.* § 154.122(a).[9]

---

[8] We note that this Court has held that a trial court's "consideration of the child-support guidelines in a modification proceeding is discretionary, not mandatory." *Brejon v. Johnson*, 314 S.W.3d 26, 30–31 (Tex. App.—Houston [1st Dist.] 2009, no pet.). There, however, this Court was considering whether a child-support order that did not comply with the statutory guidelines, in and of itself, established a material and substantial change in circumstances requiring modification. *Id.* at 31.

[9] A trial court may order child support payments in an amount that varies from the guidelines "if the evidence rebuts the presumption that application of the guidelines

*Discussion*

Here, the trial court found that the circumstances of B.E.K. had materially and substantially changed since the rendition of the 2011 Order; namely, that Kinney had demonstrated a "history or pattern of child abuse" directed at B.E.K. The trial court modified the 2011 Order, which appointed Kinney and Batten as joint managing conservators, to instead appoint Batten as B.E.K.'s sole managing conservator, with the exclusive right to designate her primary residence.

A change in a child's conservatorship and primary residence constitutes a material and substantial change that a trial court could consider in modifying a child support order. *In re J.O.A.*, No. 14-14-00968-CV, 2016 WL 1660288, at *9 (Tex. App.—Houston [14th Dist.] Apr. 26, 2016, no pet.) (mem. op.).[10] Kinney does not

---

is in the best interest of the child and justifies a variance from the guidelines." TEX. FAM. CODE § 154.123(a). In determining whether an application of the child support guidelines would be unjust or inappropriate in a particular case, the court is to consider evidence of all relevant factors. *Id.* § 154.123(b) (listing factors). And the trial court is required to make specific findings supporting any such variance. *Id.* § 154.130(a)(3), (b); *see, e.g.*, *Iliff v. Iliff*, 339 S.W.3d 74, 82 (Tex. 2011) ("[T]he trial court must make a finding of intentional unemployment or underemployment and its decision to base child support on earnings potential rather than actual earnings must be supported by the record.").

[10] *See In re V.L.K.*, No. 02-10-00315-CV, 2011 WL 3211245, at *3 (Tex. App.—Fort Worth July 28, 2011, no pet.) (mem. op.) ("[A] change in custody of a child is, in and of itself, a material and substantial change."); *Labowitz v. Labowitz*, 542 S.W.2d 922, 925 (Tex. Civ. App.—Dallas 1976, no writ) (father's appointment as managing conservator of children constituted material and substantial change requiring reallocation of financial obligations).

challenge the sufficiency of the evidence supporting the trial court's modification of conservatorship.

After the bench trial, the trial court ordered that Kinney pay monthly child support in the amount of $397.17 and ordered that she pay retroactive support in the amount of $1,191.51. In its findings of fact and conclusions of law, the trial court stated: "The provisions in the final order regarding child support to be paid by [Kinney] are in compliance with the child support guidelines found in the Texas Family Code."

The trial court found that Kinney had monthly net resources in the amount of $1,985.85 and that the percentage applicable to that amount under the guidelines set forth in Chapter 154 of the Family Code was 20 percent. Thus, Kinney's monthly child support obligation was $397.17. The trial court further found that its application of guidelines was fair and just.

Kinney argues that the trial court erred in computing her monthly support obligation because the "only and undisputed evidence [was] that her net resources were about $120 per month," not $1,985.85. Kinney explains:

> The Trial Court did follow the proper procedure set forth in Tex. Fam. Code § 154.125(b) by applying the statutory presumption of 20% child support for one child to arrive at a monthly child support obligation of $397.17 per month ($1,985.85 × 20% = $397.17) . . . . Thus Kinney does not complain about the procedure for setting child support. Kinney's complaint is simply that the Trial Court plugged the wrong number into this procedure.

24

The record shows that Kinney testified that she has a degree in psychology from the University of Texas at Austin. She had been a licensed real estate broker for 15 years, had previously worked full time as a broker, and still had an active license. Kinney testified that she was, at the time of trial, employed as a fitness instructor, teaching one class per week, and that she earned $120 per month. She stated that this was her only source of income. She noted, however, that her hours were reduced "because of COVID."

Kinney also testified that she should pay child support and was capable of earning more than $120 per month. No other evidence of her income was presented. She stated that her monthly expenses totaled approximately $2,500.00. Specifically, her apartment rent was $1,700.00 per month, and she had a monthly car payment of $397.00, insurance of $100.00, and utilities of $250.00. She further testified that she does not pay her own expenses.

A trial court is not required to accept an obligor's evidence of income and net resources as true. *In re N.T.*, 335 S.W.3d 660, 666 (Tex. App.—El Paso 2011, no pet.); *Moore v. Moore*, No. 01-13-00182-CV, 2014 WL 2538555, at *8 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.). Instead, a trial court may properly determine that an obligor has higher net resources based on testimony by the obligee and other evidence in the record. *In re N.T.*, 335 S.W.3d at 666. Moreover, a trial court may order an obligor to pay child support beyond the amount

25

the obligor's income would ordinarily indicate if she could potentially earn more money but has chosen to remain underemployed or unemployed. *Id.*; *see also Iliff*, 339 S.W.3d at 83.

Here, Batten testified:

Q. Now, are you also asking that the Court grant child support?

A. Yes.

Q. And what are you requesting the Court grant in that situation?

A. Well, I mean, my understanding is she is a broker. And real estate brokers, you know, if you look on the internet, they average making anywhere from 80 to $110,000 a year. And I don't know what she does. I don't know if she still does that. I don't know how she affords doing what she has.

Q. So, you're requesting the Court grant child support on the amount that she potentially could be making?

A. Yes.

Kinney objected that Batten had failed to plead for "deemed income." The trial court sustained the objection.

Batten's testimony regarding what Kinney might earn based on general information he obtained on the internet about the average salaries of real estate brokers is speculative. "[T]estimony is speculative if it is based on guesswork or conjecture." *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012). "Speculative testimony has no probative value." *Health Care Serv. Corp. v. East Tex. Med. Ctr.*, 495 S.W.3d 333, 339 (Tex. App.—Tyler 2016, no pet.).

26

Because Batten's testimony is speculative, it is insufficient to support the trial court's finding that Kinney earns a monthly salary of $1,985.85. *See Reagins v. Walker*, 524 S.W.3d 757, 762–63 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (holding evidence insufficient to support trial court's finding on amount of obligor's salary when only evidence offered at trial was obligee's speculative testimony based on general information obtained on internet).

"Courts may calculate net resources on 'imprecise information,' and the trial court has broad discretion in setting child support." *Ayala v. Ayala*, 387 S.W.3d 721, 727 (Tex. App.—Houston [1st Dist.] 2011, no pet.). However, "there must be some evidence of a substantive and probative character of net resources in order for the court to discharge its duty." *Id.* at 727. An obligor is required to furnish information sufficient to accurately identify her net resources and ability to pay child support. *Bello v. Bello*, No. 01-11-00594-CV, 2013 WL 4507876, at *3 (Tex. App.—Houston [1st Dist.] Aug. 22, 2013, no pet.) (mem. op.); *see* TEX. FAM. CODE § 154.062(a), .063.

In that regard, section 154.063 of the Family Code provides that a trial court "shall require" a party to (1) furnish information sufficient to accurately identify that party's net resources and ability to pay child support and (2) produce copies of income tax returns for the past two years, a financial statement, and current pay stubs. TEX. FAM. CODE § 154.063. Here, the record does not contain Kinney's

27

income tax returns for the past two years, a financial statement, or any current pay stubs. *See id.*

Because the trial court found that Kinney had monthly net resources in the amount of $1,985.85, the trial court clearly chose not to believe her testimony that her sole source of income was $120 monthly. Although Kinney's testimony reflects that she was essentially unemployed at the time of trial because of Covid restrictions, she testified that she was not unemployable. And, Batten's only testimony on the matter constituted no evidence.

The Family Code instructs that, "[i]n the absence of evidence of a party's resources, as defined by Section 154.062(b), the court shall presume that the party has income equal to the federal minimum wage for a 40-hour week to which the support guidelines may be applied." *Id.* § 154.068(a); *see Moreno v. Perez*, 363 S.W.3d 725, 736 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

With the trial court having chosen to disbelieve the only evidence in the record on Kinney's income, and there being no other probative evidence about Kinney's income, assets, or employment at the time of trial, there is no evidence supporting the trial court's determination that Kinney had monthly net resources of $1,985.85. *See Moreno*, 363 S.W.3d at 736; *Miles v. Peacock*, 229 S.W.3d 384, 390 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that trial court's finding that obligor had net resources of $6,000.00 not supported by probative evidence of

income).  Because the trial court lacked sufficient evidence upon which to exercise its discretion, we hold that it abused its discretion in calculating Kinney's child support. *See Miles*, 229 S.W.3d at 390.

Further, because the trial court's order of retroactive support is based on its calculation, which Kinney also challenges on appeal, we hold that the trial court likewise abused its discretion in calculating retroactive support.

We sustain Kinney's second issue.

### Removal of the Amicus Attorney

In her fourth issue, Kinney argues that the trial court erred in denying her motion to remove the amicus attorney, Ketterman.  According to Kinney, Ketterman failed to interview any of Kinney's witnesses, "claimed falsely to the jury that 'I speak for the child,'" and "aligned herself with one of the parties to the suit."

We review a trial court's denial of a motion to remove an amicus attorney appointed under section 107.021 of the Family Code for an abuse of discretion. *In re I.M.M.*, No. 01-17-00415-CV, 2019 WL 1768998, at *7 (Tex. App.—Houston [1st Dist.] Apr. 23, 2019, pet. denied) (mem. op.).  Again, a trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *See Worford*, 801 S.W.2d at 109.

In a suit affecting the parent-child relationship in which the best interest of the child is at issue, the Family Code authorizes the trial court to make a discretionary

appointment of an amicus attorney. *See* TEX. FAM. CODE § 107.021(a). Further, when the termination of the parent-child relationship is at issue, as here, the trial court "shall" appoint an amicus attorney unless the trial court finds that the interests of the child will be represented adequately by a party to the suit whose interests are not in conflict with the child's interests. *Id.* § 107.021(a–1)(1).

The Family Code defines an amicus attorney as "an attorney appointed by the court in a suit, other than a suit filed by a governmental entity, whose role is to provide legal services necessary to assist the court in protecting a child's best interests rather than to provide legal services to the child." *Id.* § 107.001(1); *see In re I.M.M.*, 2019 WL 1768998, at *6. An amicus attorney appointed under Chapter 107 does not represent the child or either parent, but is instead appointed specifically to assist the trial court. *See O'Connor v. O'Connor*, 245 S.W.3d 511, 515 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

Section 107.003 of the Family Code also states, in pertinent part, that an amicus attorney "shall":

(A)  [subject to certain limitations] . . . interview:
  (i)  the child in a developmentally appropriate manner, if the child is four years of age or older;
  (ii)  each person who has significant knowledge of the child's history and condition, including any foster parent of the child; and
  (iii)  the parties to the suit;

(B)    seek to elicit in a developmentally appropriate manner the child's expressed objectives of representation;

(C)    consider the impact on the child in formulating the attorney's presentation of the child's expressed objectives of representation to the court;

(D)    investigate the facts of the case to the extent the attorney considers appropriate;

(E)    obtain and review copies of relevant records relating to the child as provided by Section 107.006;

(F)    participate in the conduct of the litigation to the same extent as an attorney for a party;

(G)    take any action consistent with the child's interests that the attorney considers necessary to expedite the proceedings;

. . . .

TEX. FAM. CODE § 107.003(a)(1); *see also id*. § 107.005 (providing additional duties of amicus attorney).  Further, the amicus attorney "shall advocate the best interests of the child after reviewing the facts and circumstances of the case." *Id*. § 107.005(a).

Thus, section 107.003 required Ketterman, as amicus attorney, to interview B.E.K., who was at the time of trial fifteen years old, to interview Batten and Kinney, and to interview anyone else with "significant knowledge of the child's history and condition." *See id*. § 107.003(a)(1)(A).  It is undisputed that Ketterman interviewed B.E.K. and Batten.  Kinney conceded that Ketterman had attempted to interview her, and  the record further shows that Ketterman attempted to interview B.E.K.'s grandmother, Osberg, and "all family members":

Q.    Were you aware through the pendency of this suit through your daughter, [Kinney], that I asked her to reach out to all family

31

members, anybody she wanted me to talk to? Are you aware that that request was made?

A. *I am aware of that.*

Q. Okay. And did she ever give you my number for you to contact me?

A. She did give me your telephone number.

Q. Okay. And is there a reason you never contacted me?

A. Why I never contacted you?

Q. Yes, ma'am.

A. I was told you were going to telephone me.

Q. Who told you that?

A. Um, [Kinney] expressed to me that you were going to telephone me.

Q. Okay. Well, are you aware that she didn't give me your telephone number, that she didn't want me to talk to any of her family members without her attorney present?

A. I'm not aware of that.

(Emphasis added.) Kinney does not name any other witness with "significant knowledge of [B.E.K.'s] history or condition" that Ketterman failed to interview. *See id.*

Kinney next complains that Ketterman, as the amicus attorney, "claimed falsely to the jury that 'I speak for the child.'" By statute, however, the role of an amicus attorney is to "advocate the best interests of the child." *See id.* § 107.005(a).

Kinney next argues that the amicus attorney should have been removed because she "aligned herself" with Batten. Specifically, Kinney complains that Ketterman objected 143 times to evidence and testimony provided by Kinney, while

32

not objecting to that provided by Batten. The record shows, however, that the trial court sustained the vast majority of the amicus's objections to Kinney's proffered evidence and testimony. Thus, the amicus's objections were not without merit and do not demonstrate merely an alignment with Batten.

Kinney additionally complains that the amicus demonstrated an alignment with Batten by moving during trial for an emergency temporary order to remove B.E.K. from Kinney's home.

The record shows that, on December 8, 2020, Ketterman moved for an "Emergency Motion for Additional Temporary Orders [and] Temporary Injunctions." In her sworn motion, Ketterman stated that, during trial, she discovered that B.E.K.'s medical records reflected a history of depression and suicidal thoughts. Ketterman contacted B.E.K. by text to determine her then current state of mind. B.E.K. responded: "doing things is hard"; "I feel like I'm disappointing a lot of people"; "And that the world would be better without me here."

Accordingly, Ketterman, as amicus attorney, stated in her motion that she believed that B.E.K. was "at risk of harm in her current living situation and need[ed] the immediate protection" of the trial court. She requested that B.E.K. be removed from Kinney's care and access and that she be placed with Batten during the pendency of the trial. The amicus attorney explained that the request was for the

safety and welfare of B.E.K. and was in her best interest. And she attached copies of the medical record and text messages at issue.

Section 107.003 authorizes an amicus attorney to "participate in the conduct of the litigation to the same extent as an attorney for a party." *Id.* § 107.003(a)(1)(F). And, again, the role of an amicus attorney is to advocate for the best interest of the child. *See id*. § 107.005. Thus, the mere filing of an emergency motion to protect the safety and welfare of a child does not evidence a strategic alignment with a parent.

Finally, Kinney complains that, following the jury trial, but before the subsequent bench trial on the remaining issues, Batten and the amicus filed a joint proposed parenting plan. The trial court stated on the record, however, that it had disregarded all of the proposed parenting plans and had "not even looked at" them because they were not in evidence—a point that Kinney concedes in her reply brief.

We hold that Kinney has not demonstrated that the trial court abused its discretion in denying her motion to remove the amicus attorney.

We overrule Kinney's fourth issue.

### Amicus Attorney's Fees

In her first issue, Kinney argues that the trial court erred in characterizing the amicus attorney's fees as "necessaries for the benefit of the child," which Kinney asserts allows the fees to be enforced as child support. Kinney asserts that

"attorney's fees may not be collected as child support in a suit to modify possession," as here. She asks this Court to modify the final order to remove the reference to the amicus attorney's fees constituting "necessaries for the benefit of the child."

We also review a trial court's award of attorney's fees in a suit affecting the parent-child relationship for an abuse of discretion. *See Bruni v. Bruni*, 924 S.W.2d 366, 368 (Tex. 1996). We review a trial court's conclusions of law that bear on the issue de novo. *Keith v. Keith*, 221 S.W.3d 156, 167 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (construing contention as challenging trial court's legal conclusion that attorney's fees may be awarded as child support).

Section 106.002 of the Family Code vests a trial court with general discretion to award reasonable attorney's fees in suits affecting the parent-child relationship. TEX. FAM. CODE § 106.002(a). In addition, section 107.023 provides for reasonable attorney's fees to be awarded to an appointed amicus attorney. *Id.* § 107.023(a)(1).

Section 107.023 provides, in pertinent part, as follows:

(a)    In a suit other than a suit filed by a governmental entity requesting termination of the parent-child relationship or appointment of the entity as conservator of the child, in addition to the attorney's fees that may be awarded under Chapter 106, the following persons are entitled to reasonable fees and expenses in an amount set by the court and ordered to be paid by one or more parties to the suit:

(1)    an attorney appointed as an amicus attorney or as an attorney ad litem for the child; . . .

. . . .

35

(d)    *The court may determine that fees awarded under this subchapter to an amicus attorney . . . are necessaries for the benefit of the child.*

*Id.* § 107.023(a)(1), (d) (emphasis added).

Thus, a trial court is statutorily authorized to determine that an amicus attorney's fees awarded under section 107.023 are "necessaries for the benefit of the child." *See id.* § 107.023(d); *Tucker v. Thomas*, 419 S.W.3d 292, 297 (Tex. 2013).

Nothing in the trial court's order before us characterizes the amicus attorney's fees as child support or states that such fees may be enforced as child support. Further, this Court has held that "nothing in the Family Code's comprehensive scheme concerning awards of attorney's fees in suits affecting the parent-child relationship equates 'necessaries' with child support." *In re R.H.W. III*, 542 S.W.3d 724, 744 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

In support of her argument that characterizing attorney's fees as "necessaries" would impermissibly allow them to be collected as child support, Kinney relies on this Court's opinion in *Keith*, 221 S.W.3d at 167–68. There, however, the trial court expressly made its award of attorney's fees "collectible as child support." *Id.* at 161. There is no such language in this case.

Because section 107.023(d) expressly authorizes a trial court to award amicus attorney's fees as "necessaries for the benefit of the child," we hold that the trial

36

court did not abuse its discretion in rendering its order. *See* TEX. FAM. CODE § 107.023(d); *cf. In re R.H.W. III*, 542 S.W.3d at 744.

We overrule Kinney's first issue.

## Conclusion

We reverse the portions of the trial court's order that require Kinney to pay monthly child support in the amount of $397.17 and retroactive support in the amount of $1,191.51. We remand these issues to the trial court for further proceedings consistent with this opinion. We affirm the remainder of the trial court's order.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Kelly and Goodman.